IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DR. LESLIE SALKIN, et al. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| TEMPLE UNIVERSITY, et al. | : | NO. 05-6579 |

ORDER AND OPINION

JACOB P.  HART                                      DATE:   June 25, 2007
UNITED STATES MAGISTRATE JUDGE

Four cases are consolidated under this caption.  In each case, a professor or former professor at the Temple University School of Dentistry has asserted claims against the University and certain individual defendants under the ADEA, 29 U.S.C. § 621 *et seq*., and related state causes of action, for age discrimination, and a claim under the ADA, 42 U.S.C. § 12101, *et seq*., and the state statutes for discrimination on the basis of a disability.  The Defendants have filed four separate summary judgment motions, one for each plaintiff.  For the reasons set forth below, I will grant Defendants' Motion regarding plaintiff Alan M. Stark.

I.      Factual and Procedural Background

Dr. Stark was born in 1951.  Complaint at ¶ 5.  For many years, Dr. Stark had a private practice in the District of Columbia and Maryland, specializing in treating patients with special needs.  Alan Stark Deposition, attached to Defendants' Appendix, at 21-25.  However, in 1990 he developed an ulnar nerve neuropathy in his right hand that prevented him from practicing surgical care on patients.  Id. at 67-68.  He came to Temple University Dental School in or after 1990 as an assistant professor, and obtained tenure in 1996.  Id. at 23, 25.  He has not applied for a full professorship.  Id. at 293.  Dr. Stark remains at Temple, where he works four days a week, which is considered full time.  Id. at 138.

The neuropathy in Dr. Stark's right hand causes numbness and tingling in the fourth and fifth fingers of his right hand, as well as loss of muscle function and an inability to straighten the fingers.  Id. at 70.  He cannot scale teeth or fill cavities for a patient.  Id.  He can, however, perform all gross motor functions.  Id. at 74.  He also retains the fine motor skills to tend to his own grooming, including dressing, flossing his teeth and using a cotton swab to clean his ears.  Id. at 75-76.  He can tie his shoes.  Id. at 406.  He can turn the ignition key in a car and use a stick shift.  Id. at 78-79.  He has had to adjust his grip in order to perform these functions.  Id. at 76-77.  However, there is no ordinary life activity that he is unable to do without the assistance of another person.  Id. at 418.

Dr. Stark also testified that there are many areas in dentistry that do not require surgery, and which he can perform, including radiology, oral pathology and oral medicine.  Id. at 393.  When asked whether his neuropathy kept him from working as a dentist at Temple, he pointed out that he had been working there for some fifteen years at the time of the deposition.  Id. at 407.  He testified that he was able to perform all of the job duties of his didactic teaching responsibilities.  Id at 132.

Dr. Stark also testified, however, that he was not able to function in many clinical settings.  Specifically, he has alleged that upon three occasions during his employment at Temple, he was assigned to clinics where his impairment prevented him from handling the work.  He testified:

> My employer assigned  me – well, first transferred my clinical assignment to Dr. Daniel Boston in September of '99 when he immediately assigned me to a row in the restorative dentistry clinic where patients routinely receive intra and extracoronal restorations.  They knew or should have known that I was unable to perform those duties.  The next assault occurred in 2001 when Michael Pliskin

2

[chairman of the Department of Oral and Maxillofacial Medicine and Surgery] assigned me to the emergency oral surgery clinic where all patients are assigned to receive emergency oral surgical procedures.  I couldn't and cannot perform those duties.

And the third and final assault and the deepest assault of all was when Michael Pliskin assigned me to the emergency endodontics clinic.  That's the deepest wound in that, for the two prior assaults, he relented after he was reminded again and again that I was disabled.  In the third assault he allowed me – he allowed the assignment to stand for seven full months.

Id. at 410.

When Dr. Stark was assigned to the restorative clinic in 1999, he explained to Dr. Pliskin that he was unable to work there because of his neuropathy.  He was assigned to the Admissions Clinic, where new patients are seen.  In Dr. Stark's words:

After assaulting my disability, after placing me in an untenable position, after willfully and intentionally creating an environment that would lead to my resignation, which is what I believed Michael Pliskin and Dan Boston were doing, in a concerted, focused, deliberate, specific way, he then transferred me to an area where I could perform and do to this day perform.

Id. at 120.  As that quote implies, Dr. Stark was also quickly reassigned back to the Admissions Clinic after the 2001 assignment to the Emergency Oral Surgery Clinic.  Id. at 188-189.

When Dr. Stark was assigned to the emergency endodontics clinic, however, he was not assigned back to the Admissions Clinic for a considerable length of time.  Dr. Pliskin told Dr. Stark:  "I've discussed your assignment with Dr. Do [director of the clinic] and he's to inform you that you are not required to provide surgical service."  Id. at 289.  There were also endodontic residents who were assigned to the clinic during the seven months Dr. Stark was there, who could perform the services that Dr. Stark was unable to perform.  Id.  Dr. Stark found, however, that he was not able to help students who approached him for assistance.  Id. at 291.

3

At his deposition, Dr. Stark expressed his strong opinion as to the meaning of these

events:

> When you look at the context in which these actions occurred, there is no doubt
> that this is a willful, purposeful, intentional, malicious, vicious set of
> circumstances whose only goal is to drive senior tenured faculty from their
> positions, because they cannot fire us, and to replace us with junior faculty who
> are at risk of being fired at will.

Id. at 123.  Thus, he believed that these reassignments represented not only discrimination on the

basis of disability, but on the basis of age.

Dr. Stark identified other actions which he believed constituted age discrimination.  First,

Dr. Stark complains of a policy which troubles each of the plaintiffs in these consolidated cases –

that of 100% contact time.  In 1999, the Dental School adopted a policy applying to all full-time

faculty, including CET's, whereby "all scheduled non-student/non-teaching contact time (i.e.,

"release time") must be petitioned for, justified, and approved in advance."  Memorandum to

Periodontology Department Faculty of August 30, 1999, and Memorandum to Department Chairs

from Dean Tansy of March 24, 1999, both attached as Defendants' Exhibit 98.  In other words,

all of a faculty member's time is initially presumed to be spent in contact with students;

exceptions for class preparation, administrative activities or research required prior permission

after petition to the department chair.  Id.

According to Dr. Stark, he obtained only "sporadic non-clinic contact time" varying from

semester to semester, but in any event insufficient to allow him to prepare for his classes, or

pursue other endeavors such as speaking engagements.  Id. at 141-143.  He testified:  "Usually

I've had to hovel and grovel and beg to get slivers of time here and there when other tenured and

non-tenured faculty are provided generous amounts of non-clinic contact time for the purpose of

4

managing their courses." Id. at 144.  He named Drs. Maria Fornatora, Laurie McPhail, and Jie

Yang as having been treated more favorably in terms of release from student contact.  Id. at 145.

He also named Dr. John Suzuki and Dr. Jasim Albander.  Id. at 315-317.

Dr. Stark did not, however, have specific information as to these individuals' schedules,

relying instead on his impression of having seen them around.  See id. at 147-151 (regarding Dr.

Fornatora); 301 (regarding Dr. Yang: "I don't know what his schedule is *per se*, but every time

I've gone to see him ... he's not there ");  314 (Dr. McPhail was "always in her office") and Dr.

Albander ("rarely in the clinic, away from contact with students"); and 316 (Dr. Suzuki "he's just

rarely, if ever, around").

According to Bonny Reeder, the Dental School's Director of Administrative Services, Dr.

Fornatora is a CET who was born in 1967, Dr. McPhail is a tenured professor born in 1946, and

Dr. Yang is a tenured professor born in 1963.  Defendants' Exhibit D.  Dr. Suzuki is a tenured

faculty member born in 1946, and Dr. Albander is a tenured faculty member born in 1946.  Id.

Dr. Stark also complained of a number of acts which he said might seem relatively minor,

but which contributed to a "hostile environment" in a "war of attrition" waged by Dr. Pliskin, Dr.

Rams, Dr. Boston and Dr. Gray.  Id. at 222-224.

He complained that in 1999, he had a "convoluted line of report", where he was "totally

confused as to who I should report to for what." Id. at 214.  For example, he requested from Dr.

Pliskin time off for the Jewish holidays, and received a "scathing memo" from Dr. Boston saying

"Why are you requesting time off from Dr. Pliskin?  I'm responsible for your clinical time." Id.

at 216.  Dr. Stark said:  "This is a set of circumstances that was, in my opinion, intentionally and

artificially created to establish a hostile work environment for the purposes of driving me away

from my senior tenured faculty position at Temple." Id.  He further explained:  "It's set up

specifically so that I fail to meet somebody's expectations and give anybody – and it seems like

everybody – an opportunity to be critical." Id. at 217.

Also in 1999, Dr. Pliskin assigned Dr. Stark to Dr. Boston's restorative clinic on Friday,

but also assigned him to lecture to a first-year class that morning.  Id. at 221.  When he asked Dr.

Pliskin how this could be resolved, Dr. Pliskin laughed and told him to go to the clinic at 8:30,

"run upstairs" to give his lecture at 9:00, and "run downstairs, get back to your clinic." Id. at

223.

Another example given of hostility was Dr. Gray's moving Dr. Stark's gerontology

course in the summer of 2001 from mid-July, when he taught to fourth years, to a second-year

course, taught in mid-August.  Id. at 224-229.  Dr. Stark said that he initially thought it was a

poor pedagogical decision on the part of Dr. Gray, and then he realized that the memorandum

rescheduling the course was written by Dr. Pliskin:

> And then it dawned on me.  What is this?  A willful, intentional, deceitful,
> arbitrary, capricious action designed to create a hostile work environment to drive
> me away from my tenured faculty position because they can't fire me because I'm
> a good faculty member.  This is exactly, precisely the time of year that for the past
> ten years I took vacation.  He moved this course to the middle of the time that I
> take vacation with no justification, with no rationale.  And this, I believe was a
> focused, dedicated, arbitrary nasty, ugly move; again, a war of attrition.

Id. at 229.

As Dr. Stark describes it, when he asked Dr. Pliskin what his rationale was for moving

the course, Dr. Pliskin "looked at [him] with cold, steely eyes and said ... you don't got to like it.

You just got to do it and I ain't gonna tell you why I did it.  I did it because I can.  You don't like

it?  Leave." Id. at 232.

Moreover, in 2004, Dean Pliskin removed Dr. Stark from both the Faculty Senate Steering Committee and the University Appeals Committee.  Id. at 263-265.  Dr. Pliskin justified this move in a memorandum to provost Ira Schwartz by explaining that, in order to serve on these committees, Dr. Stark had requested release time of one day per week, out of his four workdays.  Defendants' Exhibit 407.  Because of recent faculty losses in the department, Dean Pliskin was unwilling to grant this release time.  Id.  After appealing to the college president, Dr. Stark was reinstated on the Faculty Senate Steering Committee.  Stark Deposition at 269.

When asked at his deposition why this was an act of age discrimination, Dr. Stark replied:

I was a senior tenured faculty member in the School of Dentistry, who was now granted access to the highest echelons of the university, interacting with senior university administration, learning about the workings of the university which were significantly different than the workings of the School of Dentistry.  I would bring some of these issues back and question the dental school administration, indirectly, often, and I believe they viewed that as a threat.

Id. at 274-275.

Also at his deposition, this exchange took place:

COUNSEL:  Did Dr. Pliskin ever say anything to you that indicated a discriminatory bias against older people?

DR. STARK:  Dr. Pliskin never said to me I hate older people.  What Dr. Pliskin did say to me and what the dean said to me were things like, and I quote, My life would be a whole lot simpler if all of my faculty were CETs.

Id. at 233.  Apparently, these were words from Dr. Pliskin, quoting Dean Tansy, in the year 2000, during the period when the CET track was instituted.  Id. at 234.

Dr. Stark explained:

This gives him a foothold in driving senior tenured faculty away because he no longer needs them.  Now he's got a ready cache of unlicensed, uncredentialed, foreign trained individuals.  They never sit for licensing exams.  They never sit for

national boards.  We don't know anything about their credentials.

Id. at 243-244.

Later, Dr. Stark once again emphasized:

Its not that we're being treated less favorably than clinician educator track faculty.
It's that they have singled out the senior tenured faculty for hostile treatment in a
purposeful attempt to drive them from their positions since they can't terminate
us.  The CETs operate under the constant pressure of having fixed and finite
contracts.  And they know that, they, the CETs, know that if they don't tow the
line, if they don't behave, and behave means don't ask questions, don't make
trouble, don't make waves, don't place any demands, they know that if they do
that, then the administration will allow their contracts to run out and not renew.
That's what we contend.  So they use these people to drive us away.

Id. at 307.

In 2005, Dr. Stark received no merit pay increase.  Id. at 362.  He stated:  "I had received

a right to sue a letter from EEOC ... without any justification presented to me at the time, I can

only assume that this is a willful, wanton act of retaliation."  Id. at 364.  In a memorandum from

Dr. Pliskin to Dean Tansy of June 21, 2005, entitled "Dr. Alan Stark; Justification for Merit

Raise Ineligibility", Dr. Pliskin wrote that Dr. Stark had demonstrated dereliction of his duties

and insubordination in the past year.  Defendants' Exhibit 408.  Specifically, he signed blank

patient progress notes and included an inappropriate note in a patient progress chart.  Id.

Insubordination involved his "persistent refusal to perform competency examinations in the

Radiology Clinic."  Id.

At his deposition, Dr. Stark conceded that on at least one occasion he had signed a

progress note before it was filled in by a student in his clinic.  Stark Deposition at 369.  He also

acknowledged writing "Patient dropped for no show.  Why is this pt. reregistered?"  on a patient

progress note sheet.  Id. at 376-377 and see Exhibit 408.  He also agreed that he had refused to do

8

radiology competency examinations because he did not feel competent to do so.  Id. at 201-207,

390-391.  After an exchange of memoranda, Dr. Pliskin wrote to Dr. Stark, informing him that

continued refusal to evaluate radiology competencies would "be viewed as insubordinate."

Exhibit 408.  Dr. Pliskin also directed Dr. Stark to report to Dr. Jie Yang, the head of the

radiology clinic, to be trained to perform competency examinations.  Id.

  In December, 2005, Dr. Stark filed a Complaint in this action.  He has named only

Temple University and Dr. Pliskin as defendants.

II. Legal Standards

A. Summary Judgment

  Summary judgment is warranted where the pleadings and discovery, as well as any

affidavits, show that there is no genuine issue as to any material fact and that the moving party is

entitled to judgment as a matter of law.  Fed. R. Civ. Pr. 56.  The moving party has the burden of

demonstrating the absence of any genuine issue of material fact. Celotex Corp.. v. Catrett, 477

U.S. 317, 323 (1986).

  When ruling on a summary judgment motion, the court must construe the evidence and

any reasonable inferences drawn from it in favor of the non-moving party.  Anderson v. Liberty

Lobby, supra at 255;  Tiggs Corp. v. Dow Corning Corp., 822 F.2d 358 , 361 (3d Cir. 1987).

Nevertheless, Rule 56 "mandates the entry of summary judgment ... against a party who fails to

make a showing sufficient to establish the existence of an element essential to that party's case,

and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett at 323.

B.     The ADA

To qualify as disabled under the ADA, an individual must have an impairment; however, merely having an impairment does not make one disabled for the purposes of the ADA.  Toyota Motor Mfg. of Kentucky, Inc. v. Williams, 534 U.S. 184, 194-195 (2002).  A claimant must also demonstrate that the impairment substantially limits a major life activity.  Id.; 42 U.S.C. § 12102(2); Sutton v. United Air Lines, Inc., 527 U.S. 471, 483 (1999).

Under the EEOC regulations,  major life activities most relevant to this case are those of "performing manual tasks" and "working."  29 CFR § 1630.2(j)(3)(I).  In determining whether a person is substantially limited in performing manual tasks, it is a mistake to consider only those tasks connected with his job; instead, the person must be prevented or severely restricted from doing activities that are of central importance to most people's daily lives.  Toyota Motor, supra, at 185.

To be substantially limited in the major life activity of "working", an individual must be unable to perform either a class of jobs or a broad range of jobs in various classes.  29 CFR § 1630.2(j)(3)(I).  Inability to perform a single type of job, a particularized job, or a particular choice of job does not constitute a substantial limitation in the major life activity of working.  Id; Sutton v. United Air Lines, supra, at 491.  In Sutton, the United States Supreme Court ruled that severely myopic plaintiffs were not disabled under the ADA simply because they were not able to work as global airline pilots, where there were other piloting jobs available to them.  527 U.S. at 493.

C.    The ADEA

The ADEA prohibits employers from discriminating against individuals in hiring, discharge, compensation, term, conditions or privileges of employment on the basis of their age. 29 U.S.C. § 632(a)(1); Duffy v. Paper Magic Group, Inc., 265 F.3d 163, 167 (3d Cir. 2001).  In ADEA cases involving indirect evidence, a court will apply a modified version of the burden-shifting analysis developed by the Supreme Court for use in Title VII cases in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Anderson v. Consolidated Rail Corp., 297 F.3d 242, 249 (3d Cir. 2002).

Under the first step of the McDonnell-Douglas analysis, a plaintiff must establish a *prima facie* case.  To show disparate treatment under the ADEA, a *prima facie* case is established by showing by a preponderance of the evidence that (1) the plaintiff belongs to the protected class; i.e., is older than forty; (2) the employee was qualified for the position in question; (3) he suffered an adverse employment action; and (4) a similarly situated younger person was treated more favorably.  Williams v. Pittsburgh Public Schools, Civ. A. No. 03-1983, 2006 WL 515586 (W.D. Pa. Feb. 28, 2006).

If the plaintiff is able to show a *prima facie* case, the burden of production shifts to the employer, who must offer evidence of a legitimate, non-discriminatory reason for its actions. McDonnell Douglas, supra; Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994); Williams, supra.  If an employer can do this, the burden of production returns to the plaintiff, who, in order to avoid summary judgment, must show by a preponderance of the evidence that the explanation given for the employment decision is a pretext for discrimination.  Fuentes, supra; Williams, supra.

It is also possible to show discrimination under a disparate impact theory.  A *prima facie* case under a disparate impact theory requires a showing that an employment practice that is facially neutral in its treatment of different groups in fact falls more harshly on one group than another and cannot be justified by business necessity.  Hazen Paper Company v. Biggins, 507 U.S. 604, 609 (1993).  Proof of discriminatory motive is not necessary under a disparate impact theory.  Id.  Evidence in disparate impact cases usually focuses on statistical disparities, rather than specific incidents, and on competing explanations for those disparities.  Watson v. Fort Worth Bank & Trust, 487 U.S. 477, 487 (1988).

III.    Discussion

A.    The ADA

Dr. Stark's impairment does not rise to the level of a disability under the ADA.  As to the major life activity of performing manual tasks, it is clear that Dr. Salkin's neuropathy does  not prevent or severely restrict him from doing activities that are of central importance to most people's daily lives, such as driving and engaging in self-care.  See 29 CFR § 1630.2(j)(3)(I); Toyota Motor, supra, at 185.  At his deposition, Dr. Stark he stated that there is no ordinary life activity that he is unable to perform without assistance.

Dr. Stark's deposition testimony, as well as the fact that Dr. Stark is actually working as a professor of dentistry, also show that he is not substantially limited in the major life activity of working.  He is restricted in that he is unable to perform dental work on patients.  However, not only is he able to lecture, but, as he testified, he can still perform as a dentist in the areas of radiology, oral pathology and oral medicine.  Stark Deposition at 393.  His inability to perform dental surgery is like the Sutton plaintiffs' inability to work as global airline pilots – in inability to perform a single, particular job, rather than a broad class of jobs.

12

Thus, Dr. Stark's limitation does not qualify him for protection under the ADA. I will grant Defendants' motion for summary judgment against him on his ADA discrimination claim. Retaliation is discussed below.

B.     The ADEA

1.     Direct Evidence

Dr. Stark has not come forward with any direct evidence of discrimination against him on the basis of his age. In fact, when he was asked whether Dr. Pliskin had ever said anything indicating a bias against older people, Dr. Stark said that he had not. Stark Deposition at 233. Instead, he quoted Dr. Pliskin as saying "My life would be a whole lot simpler if all of my faculty were CETs." Id.

This raises the crucial point that the plan alleged by Dr. Stark, to drive away senior tenured faculty and replace them with CETs, does not constitute age discrimination. Even if this plan exists exactly as described by Dr. Stark, it would not raise a claim under the ADEA because Dr. Stark has not shown that age, rather than tenure, was the factor motivating the plan.

In Hazen Paper Company v. Biggins, 507 U.S. 604 (1993), the United States Supreme Court decided that there is no disparate treatment under the ADEA when the factor motivating the employer is some feature other than the employee's age – even if the motivating factor is correlated with age. Id. at 609, 611. In that case, the employee, Biggins, was terminated at the age of 62 after nine years of service, a few weeks short of the date when his pension would vest. The Supreme Court held that, although interference with pension benefits is illegal under ERISA, Biggins' theory did not constitute age discrimination because pension-eligibility is "analytically distinct from age." Id. at 611.

13

The Supreme Court explained:

> Perhaps it is true that older employees of Hazen Paper are more likely to be "close to vesting" than younger employees. Yet a decision by the company to fire an older employee solely because he has nine-plus years of service and therefore is "close to vesting" would not constitute discriminatory treatment on the basis of age. The prohibited stereotype ("Older employees are likely to be _____") would not have figured in this decision, and the attendant stigma would not ensue. The decision would not be the result of an inaccurate and denigrating generalization about age, but would rather represent an *accurate* judgment about the employee – that he indeed is "close to vesting."

Id. at 611-612. (Emphasis in original).

Relying upon Hazen, the Court of Appeals for the Third Circuit affirmed an order of summary judgment for the defendant where a plaintiff claimed he was the subject of age discrimination when he was terminated because of his high salary which, he argued, correlated with his age. Bernhard v. Nexstar Broadcasting Group, Inc., 146 Fed. Appx. 582 (3d Cir. 2005). The Bernhard court wrote: "Bernhard's salary is analytically distinct from his age, and therefore, could serve as a legitimate reason for terminating him." Id. at 858.

In this case, even though Dr. Stark is over forty, his tenured status is analytically distinct from his age. Assuming there is such a plan, its goals would be met if Dr. Stark had been replaced with a CET with his same date of birth. Dr. Stark has presented no evidence showing the ages of the CETs in his department. As an indication that not all CETs are young, however, I note that evidence provided by the Defendants indicates that three out of the seven CETs in the Restorative Dentistry department in 2005-2006 were older than Dr. Stark. Defendants' Exhibit E. All seven were over forty. Id.

14

As noted in the fact section of this Opinion, Dr. Stark himself has opined that this alleged plan was not motivated by the age of tenured faculty, but rather by the independence conferred by tenure.  Stark Deposition at 123, 274-275.

2.    Indirect Evidence

Because Dr. Stark has so firmly tied his case to a theory which does not constitute a claim of age discrimination, it is not clear whether any further examination of his allegations is necessary.  However, for the sake of carefulness, I have sought to determine whether Dr. Stark has shown some indirect evidence of discrimination on the basis of age.

I have concluded that the evidence he has put forth is not sufficient to withstand summary judgment.  Dr. Stark will not be able to establish a *prima facie* case of age discrimination under McDonnell Douglas because he has not shown that any younger comparitor was treated more favorably than he.

As to issues relating to student contact and release time, Dr. Stark has identified as comparitors Drs. Fornatora, McPhail, Yang, Suzuki and Albander.  According to Bonny Reeder, Dr. McPhail, Dr. Suzuki and Dr. Albander are all older than Dr. Stark, and therefore can not satisfy the fourth element of the McDonnell Douglas analysis.  Defense Exhibit D.

The fact that three out of five of the named comparitors are, in fact, older individuals, indicates that something other than age must be at play.  Nevertheless, even if only Dr. Fornatora and Dr. Yang are considered, Dr. Stark's evidence is still insufficient.  He has come forward only with his own testimony that these doctors do not appear to be around the clinic at all times.  He has not offered any evidence as to their duties, necessary to determine whether they are proper comparitors.  Nor has he offered more precise evidence as to their student contact time.

15

This weakness in the evidence is not limited to Dr. Stark's deposition testimony.  He has come forward with no other evidence in this regard.  It does not appear that Dr. Fornatora or Dr. Yang were deposed.  Dr. Stark has not produced tabulated information regarding release time similar to that which Defendants' have obtained from Ms. Reeder. Summary judgment is appropriate in an employment discrimination case when a plaintiff relies on 'mere inferences, conjecture, speculation or suspicions.'  Huggins v. Teamsters Local 312, 585 F. Supp. 148, 150-151 (E.D. Pa. 1994), citing Robin Construction Co. v. United States, 345 F.2d 610, 613 (3d Cir. 1965).

3.      Disparate Impact

By repeatedly asserting at his deposition that the acts directed toward him were part of a "willful, purposeful, intention, malicious and vicious" war of attrition, he has effectively precluded any reliance on a disparate impact theory.  The consolidated response to the four motions for summary judgment does not appear to raise a disparate impact theory either, although there is a rather cryptic reference to disparate impact in Title VII cases.

Nevertheless, I will briefly point out that, even if it had been raised, a disparate impact theory would not have passed summary judgment on the record before me.  The plan Dr. Stark has alleged may have affected only people over 40, if there were no younger tenured faculty members in his department at the relevant times.  However, Dr. Stark has only alleged a general pattern of harassment, and not a specific practice on the part of the Dental School.  The United States Supreme Court has said:

> It is not enough to simply allege that there is a disparate impact on workers, or point to a generalized policy that leads to such an impact.  Rather, the employee is "responsible for isolating and identifying the *specific* employment practices that

16

are allegedly responsible for any observed statistical disparities." [Wards Cove
Packing Co. v. Atonio] 490 U.S. [642,] 656, 109 S. Ct. 2005 (emphasis added).

Smith v. City of Jackson, Mississippi, 544 U.S. 228, 241 (2005).

Dr. Stark has not pointed to any specific employment practice on the part of the Dental

School which would tend to favor either younger tenured professors, or younger CETs.  Just as

important, he has not come forward with statistical material which would show a disparity.

4.      Retaliation

Dr. Stark has alleged that Defendants' failure to offer him a merit raise in 2005 was in

retaliation for his having made claims against them for discrimination on the basis of age and

disability.  Even if Dr. Stark can show a *prima facie* case for retaliation, however, no reasonable

juror could find that Defendants' stated reasons for not giving him a raise were pretextual.

Defendants have alleged that it was Dr. Stark's signing of blank treatment notes, his entry

of an improper note on a patient progress note sheet, and his protracted refusal to perform

radiology competency examinations which caused them to deny him a merit raise.  Defendants'

burden in showing a legitimate, non-discriminatory reason for their action is not a heavy one.

Johnson v. Keebler-Sunshine Biscuits, Inc., 214 Fed. Appx. 239, 242 (3d Cir. 2007), citing

Woodson v. Scott Paper Co., 109 F.3d 913, 920 n. 2 (3d Cir. 1997).  They have met it.

Dr. Stark asked rhetorically at his deposition whether there were other faculty members

"who have signed a chart once in 15 years that a student failed to fill out."  Stark Deposition at

370.  He asked:  "If so, did they catch it?  Did they find it?  Did they deny merit and cost of

living and accuse somebody of a lapse of personal or professional integrity for one signature, one

in the 15 or so years ... ?"  Id at 370-371.  These are crucial questions.  However, the burden for

answering them lay not with Defendants, but with Dr. Stark himself.  He has not come forward with any evidence that similar transgressors were treated more leniently.  Therefore, he cannot rebut Defendants' good faith reasons for denying him a merit raise, as required by <u>McDonnell Douglas</u>.

E.      The State Causes of Action

Age discrimination claims brought pursuant to the PHRA are analyzed under the same standards used by federal courts in interpreting the ADEA.  <u>Simpson v. Kay Jewelers</u>, 142 F.3d 639, 644 n. 5 (3d Cir. 1998).  It is less clear what law is used to analyze a case brought under the PCFO.  Federal courts considering cases with PCFO claims appear to assume that the well-developed federal civil rights case law applies.  <u>See</u>, <u>e.g.</u>, <u>Joseph v. Continental Airlines, Inc.</u>, 126 F. Supp.2d 373 (E.D. Pa. 2000) (granting summary judgment in an employment discrimination case asserting claims under Title VII, PHRA and PCFO).  Since Dr. Fielding has not pointed to any other relevant PCFO standard, I will also assume that the federal analysis applies.

IV.     Conclusion

For the reasons set forth above, I now enter the following:


O R D E R

AND NOW, this     25th        day of    June           , 2007, upon consideration of Defendants' Motion for Summary Judgment as to Plaintiff Alan M. Stark, filed in this case as Document No. 33, and Plaintiffs' response thereto, as well as Defendants' reply, it is hereby ORDERED that Defendants' Motion is GRANTED.  JUDGMENT is ENTERED in favor of

Defendants and against plaintiff Alan M. Stark, and Alan M. Stark's Complaint is hereby

DISMISSED with prejudice.

 This case shall be marked CLOSED for statistical purposes.


     BY THE COURT:


      /s/Jacob P. Hart

     _____
     JACOB P. HART
     UNITED STATES MAGISTRATE JUDGE