IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DR. LESLIE SALKIN, et al.              :    CIVIL ACTION
                                       :
   v.                                  :
                                       :
TEMPLE UNIVERSITY, et al.              :    NO. 05-6579

ORDER AND OPINION

JACOB P. HART                                    DATE:  June 25, 2007

UNITED STATES MAGISTRATE JUDGE

Four cases are consolidated under this caption. In each case, a professor or former professor at the Temple University School of Dentistry has asserted claims against the University and certain individual defendants under the ADEA, 29 U.S.C. § 621 *et seq*., and related state causes of action, for age discrimination. The Defendants have filed four separate summary judgment motions, one for each plaintiff. For the reasons set forth below, I will grant Defendants' Motion regarding plaintiff Leslie Salkin.

I.    Factual and Procedural Background

Dr. Salkin was born in 1941. Salkin Deposition at 6. He began working at the Dental School in 1970 as an assistant professor. Complaint at ¶ 9. He was awarded tenure in 1974, and promoted to full professor in 1977. Salkin Deposition at 23, 24. Dr. Salkin resigned his position at Temple in August, 2006. Id. at 69.

On June 12, 2003, Dr. Salkin met with Sandra Foehl, of the University's Affirmative Action Office to discuss what he called "pervasive harassment of senior faculty in the Department of Periodontology" by the chair of that department, Dr. Thomas Rams, who he "assumed was following the guidance of Dean Tansy." Exhibit 87; Salkin Deposition at 31-34.

He told Ms. Foehl that senior tenured faculty was being isolated from the department – for example, there had not been a department meeting scheduled for four years, and there had been meetings for nontenured faculty which tenured faculty were not invited to attend. Id. at 35-37. More precisely, Dr. Salkin "assumed that the department had to have meetings" to which he was not invited, although he could not identify a specific meeting when asked at his deposition. Id. at 42-43.

Dr. Salkin also complained to Ms. Foehl of the Dental School's "release time" policy. In 1999, the Dental School adopted a policy applying to all full-time faculty, including CETs, whereby "all Scheduled non-student/non-teaching contact time (i.e., "release time") must be petitioned for, justified, and approved in advance." Memorandum to Periodontology Department Faculty of August 30, 1999, and Memorandum to Department Chairs from Dean Tansy of March 24, 1000, both attached as Defendants' Exhibit 98. In other words, all of a faculty member's time is initially presumed to be spent in contact with students; exceptions for class preparation, administrative activities or research required prior permission after petition to the department chair. Id. Dr. Salkin told Ms. Foehl that he was not granted enough release time to let him adequately prepare for his lectures or conduct research. Exhibit 87.

At Dr. Salkin's deposition, the following exchange occurred:

> COUNSEL: Do you contend that the change to 100% student contact time in 1998 was made because you were over the age of 40?
>
> DR. SALKIN: Yes. It was made because I was a senior tenured faculty, and our senior tenure faculty were all over 40 and there was an effort to drive them out of the school.

Salkin Deposition at 43.

However, Dr. Salkin was not able to identify younger individuals who did not have 100% student contact time.  Id. at 50-51.  He was also unable to say whether he had more or less release time than anyone else in his department, tenured or untenured, and of any age, during the relevant period.  Id. at 89.

Dr. Salkin also told Ms. Foehl that he had received inadequate merit pay increases, and no increase in the 2002-2003 year, and that Dean Tansy's office had not responded to his request for procedural information as to how merit in a faculty member is assessed.  Exhibit 87, Salkin Deposition at 178-179.  At his deposition, however, he conceded that he did not know whether anyone had higher raises than his.  Salkin Deposition at 176.  Further, as far as he knew, no one received more information about their raises than he did.  Id. at 179-180.

Dr. Salkin complained that he had to fund his own attendance at professional meetings, and that he was expected to use vacation time to go to a meeting unless he was a presenter.  Exhibit 87.  Although it is clear that Ms. Foehl investigated Dr. Salkin's concerns, it is not clear whether there was an official outcome.  Id.

In 2003, Dr. Salkin, and a colleague (and co-plaintiff), Dr. Kenneth Boberick, were invited to apply to participate in research regarding the relationship between low weight, pre-term births and periodontal infection.  Salkin Deposition at 95-97.  In November, 2003, Drs. Salkin and Boberick were notified that they had been awarded the grant.  Id. at 95.  They met with Dr. Soprano, the vice-provost for research, to discuss the grant because Dean Tansy was out of the country for a week.  Id. at 95-97.

When Dr. Rams and Dean Tansy became aware of the project, apparently a number of months later, they intervened in the process, seeking a meeting with Dr. Jennifer Culhane, the

Drexel professor who was the primary investigator for the periodontal portion of the grant. Id. at 108, 111-114. Dr. Salkin testified at his deposition that he had spoken with Dr. Culhane about this meeting, which took place in July, 2004:

> DR. SALKIN: She told me that she met with Dr. Tansy, Dr. Rams and Dr. Boston ... and she said it was the weirdest meeting she's ever attended. She first asked why the PIs weren't there and Dr. Tansy informed her, because we didn't know about it and she was from here on forbidden, forbidden, to talk with us concerning the grant. And then she kind of said after that, the meeting went real downhill. And that the reason she called me was that she said this grant is not going to Temple.
>
> COUNSEL: Did she give you specifics, other than saying the meeting went downhill?
>
> DR. SALKIN: . . . The one thing that she did say was that she was quite surprised that Dr. Tansy and Dr. Rams maligned Dr. Boberick and myself. . . . She said we were loose guns and couple of other things. She also – he brought up the fact that he thought I was too old to take on this grant, as I wouldn't be there to finish it. It was a three-year grant. . . . She told me that basically he said, why do I have this grant, I'm too old, I won't be here to finish it.

Id. at 112-114.

> Dr. Salkin added:
>
> Now, a very interesting thing occurred here, also. A new member of the department came, named Suzuki, and in it he was going to take over as the dean for research. And in there it said that Dr. Suzuki was going to be doing research with pre-term low birth weight and periodontal disease, this was in the school newspaper at this time, when, obviously, I guess they thought they still had the grant.

Id. at 121. Dr. Salkin suggested that before the defendants realized that Temple had lost the grant, they had planned to replace him and Dr. Boberick with Dr. Suzuki. Dr. Suzuki is a tenured professor who was born in 1946. Defendants' Exhibit D.

Dr. Salkin has attached to his response an affidavit from Professor Culhane, dated May 14, 2007.  Although she describes the meeting at Temple, she does not mention any statement about Dr. Salkin's age having been made.  In relevant part her affidavit reads:

> Robert Goldenberg, Michelle DiVito and I went to Temple to meet with the Dean, the Chair, Mike [Salkin] and others ???  I really don't remember specific information from this meeting but I do remember that it was unusual.  I have never met with the Chair or the Dean of the school to which the subcontract is issued.  I have only worked with the co-investigator and the co-investigator works with their own university.  It seemed that they did not want the grant to run through Temple as they stated no capacity to fulfill the grant requirements.  As a result of this meeting, I decided that the grant would be better served to make alternative arrangements for the periodontal treatment piece.  I have no idea what was behind their behavior but it did seem that the leadership did not want Mike to bring the grant through Temple.

Affidavit of Jennifer Culhane, Attached to Response as Exhibit 14.  (Brackets added, punctuation in original).

Dr. Salkin testified:

> It was just a general hostile environment set up to drive out the faculty who were older, tenured, who would also speak up, replaced by, I think they were CETs, I don't even know what their rank was, but I'm assuming that they were CETs.  And a CET is an individual who serves at the pleasure of the dean on a limited contract, usually one to three years.  If he is a foreign individual that's brought in and he's terminated, he has to leave the country.  So the leverage on these people is – is – it's almost total.  It's almost – it's either do it my way or leave.

Salkin Deposition at 140.  Dr. Salkin also expressed concern to Dr. Rams that the CETs did not appear to have appropriate dentist credentials, but only teaching licenses.  Id. at 80-81.  However, he "never learned that any particular individual that was working under [him] had a teaching license." Id. at 83.  See, also, id. at 165-168.

Another aspect of this environment, according to Dr. Salkin, was his exclusion from a hiring search committee in 2004, while individuals with lesser education and experience, such as a dental hygienist who was a tenured member of their department, were included.  Id. at 147-151.

The hygienist had been at Temple for approximately 30 years. Id. at 151. Dr. Salkin testified that he was also unfairly excluded from offering input into a 2004 site visit by the Council on Dental Accreditation. Id. at 151-155.

Dr. Salkin conceded that no one at Temple had ever threatened to fire him. However, he testified that he retired because of the "hostile, unpleasant environment, day after day, where you know people are not going to let you do your job." Id. at 68.

When defense counsel asked Dr. Salkin at his deposition for the specific names of individuals he claims were treated differently than he, Dr. Salkin named only Dr. Jason Albander, who may have taken Board examinations without the proper qualifications. Id at 159. Dr. Salkin conceded, however, that "he did not know" and could not make a conclusion as to whether Dr. Albander actually lacked those qualifications. Id. at 161.

Dr. Salkin did not name any other individual who he claims was treated preferentially, though he testified he was "pretty certain" that none of the CETs had 100% student contact. Id. at 162. He said: "Again, not having access to schedules, because that seemed to be secret, I don't know." Id.

It is also relevant that in 1998 or 1999, Dr. Salkin and a number of other Dental School faculty sued Temple University, and individual defendants including Dean Tansy and Dr. Rams for defamation. Id. at 20-22. The case was settled before trial. Id. at 22. Defense counsel asked Dr. Salkin at his deposition: "Do you think it's possible that Dr. Rams is hostile to you because you sued him in the past?" Dr. Salkin replied: "I have no idea." Id. at 69.

Dr. Salkin filed an administrative complaint with the EEOC and the PCHR on March 4, 2005. Defendants' Exhibit 411.

II.     Legal Standards

A.      Summary Judgment

Summary judgment is warranted where the pleadings and discovery, as well as any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. Pr. 56.  The moving party has the burden of demonstrating the absence of any genuine issue of material fact. Celotex Corp.. v. Catrett, 477 U.S. 317, 323 (1986).

When ruling on a summary judgment motion, the court must construe the evidence and any reasonable inferences drawn from it in favor of the non-moving party.  Anderson v. Liberty Lobby, supra at 255;  Tiggs Corp. v. Dow Corning Corp., 822 F.2d 358 , 361 (3d Cir. 1987). Nevertheless, Rule 56 "mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett at 323.

B.      The ADEA

The ADEA prohibits employers from discriminating against individuals in hiring, discharge, compensation, term, conditions or privileges of employment on the basis of their age. 29 U.S.C. § 632(a)(1); Duffy v. Paper Magic Group, Inc., 265 F.3d 163, 167 (3d Cir. 2001).  In ADEA cases involving indirect evidence, a court will apply a modified version of the burden-shifting analysis developed by the Supreme Court for use in Title VII cases in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Anderson v. Consolidated Rail Corp., 297 F.3d 242, 249 (3d Cir. 2002).

Under the first step of the McDonnell-Douglas analysis, a plaintiff must establish a *prima facie* case. To show disparate treatment under the ADEA, a *prima facie* case is established by showing by a preponderance of the evidence that (1) the plaintiff belongs to the protected class; i.e., is older than forty; (2) the employee was qualified for the position in question; (3) he suffered an adverse employment action; and (4) a similarly situated younger person was treated more favorably. Williams v. Pittsburgh Public Schools, Civ. A. No. 03-1983, 2006 WL 515586 (W.D. Pa. Feb. 28, 2006).

If the plaintiff is able to show a *prima facie* case, the burden of production shifts to the employer, who must offer evidence of a legitimate, non-discriminatory reason for its actions. McDonnell Douglas, supra; Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994); Williams, supra. If an employer can do this, the burden of production returns to the plaintiff, who, in order to avoid summary judgment, must show by a preponderance of the evidence that the explanation given for the employment decision is a pretext for discrimination. Fuentes, supra; Williams, supra.

It is also possible to show discrimination under a disparate impact theory. A *prima facie* case under a disparate impact theory requires a showing that an employment practice that is facially neutral in its treatment of different groups in fact falls more harshly on one group than another and cannot be justified by business necessity. Hazen Paper Company v. Biggins, 507 U.S. 604, 609 (1993). Proof of discriminatory motive is not necessary under a disparate impact theory. Id. Evidence in disparate impact cases usually focuses on statistical disparities, rather than specific incidents, and on competing explanations for those disparities. Watson v. Fort Worth Bank & Trust, 487 U.S. 477, 487 (1988).

III.     Discussion

A.      Direct Evidence

Dr. Salkin has not pointed to any direct evidence of a plan by the defendants to drive tenured professors from their jobs on account of their age and replace them with CETs. If, as he testified at his deposition, one or more of the defendants told Dr. Culhane that Dr. Salkin was too old to take on the Drexel research grant, this would constitute direct evidence that his age was a factor in Defendants' interference with this project.

Dr. Culhane, however, has not confirmed Dr. Salkin's version of the meeting. In her affidavit she wrote: "I really don't remember specific information from this meeting" and added "I have no idea what was behind their behavior." Dr. Salkin has come forward with no affidavit or deposition testimony from any other person who attended the meeting. Dr. Salkin, of course, cannot testify at trial as to what Dr. Culhane told him about the meeting, because this would constitute hearsay. FRE 801, 802. Thus, Dr. Salkin will not be able to present direct evidence of discrimination at trial unless he produces Dr. Culhane, who would then have to contradict her own statements as set forth in the affidavit.

B.      Indirect Evidence; Disparate Treatment

Dr. Salkin has shown that Dr. Rams was unwilling to accommodate his wishes or consider his advice in many instances. If Dr. Salkin's burden was only to prove that Dr. Rams' behavior and decisions created an atmosphere which was uncongenial to him, he would have shown enough to create a triable issue of fact. It may even be true, as Dr. Salkin suggests, that Dr. Rams is an unpleasant person, and that he treated Dr. Salkin with disrespect. However, this is an ADEA action, and Dr. Salkin must prove that his age was a motivating factor in this treatment in order to prevail.

9

In a disparate treatment case, liability depends on whether age actually motivated the employer's decision. Reeves v. Sanderson Plumbing Products, Inc., 503 U.S. 133, 140 (2000), citing Hazen Paper Co. v. Biggins, 507 U.S. 604 (1993). For this reason, comparitor evidence is necessary. Dr. Salkin has not pointed to a single younger individual who was treated more favorably that he, and he therefore cannot show the fourth element of a *prima facie* case of discriminatory treatment under McDonnell Douglas.

Dr. Salkin did not know whether younger colleagues had more or less release time than he had, or whether their raises were actually larger or smaller. He was not certain that CETs had less than 100% student contact time. He did not know whether other faculty members were given the information about peoples' schedules and salaries which he was denied. He was not able to name a single individual whom he actually knew to have been treated more favorably.

Not every plaintiff can testify at his deposition like a human catalog of statistical evidence. Crucially, however, Dr. Salkin has not come forward with other evidence to fill in the gaps in his personal knowledge. This, despite a lengthy discovery period, which was extended twice at the request of the parties. "Summary judgment is appropriate in an employment discrimination case when a plaintiff relies on 'mere inferences, conjecture, speculation or suspicions.'" Huggins v. Teamsters Local 312, 585 F. Supp. 148, 150-151 (E.D. Pa. 1994), citing Robin Construction Co. v. United States, 345 F.2d 610, 613 (3d Cir. 1965).

Indeed Dr. Salkin's theory that a hostile environment was intentionally created to drive out tenured faculty so that they could be replaced by more pliable, non-tenured, CETs, does not

implicate age discrimination.[1]  Even though Dr. Salkin spoke specifically of "*older*, tenured" faculty, it is evident that – if the goal was to consolidate power in the administration – the tenure status of an individual would be the criterion for discrimination, and not his age.

In <u>Hazen Paper Company v. Biggins</u>, 507 U.S. 604 (1993), the United States Supreme Court decided that there is no disparate treatment under the ADEA when the factor motivating the employer is some feature other than the employee's age, even if the motivating factor is correlated with age.  <u>Id</u>. at 609, 611.  In that case, the employee, Biggins, was terminated at the age of 62 after nine years of service, a few weeks short of the date when his pension would vest.  The Supreme Court held that, although interference with pension benefits is illegal under ERISA, Biggins' theory did not constitute age discrimination because pension-eligibility is "analytically distinct from age."  <u>Id</u>. at 611.

> The Supreme Court explained:
>
> Perhaps it is true that older employees of Hazen Paper are more likely to be "close to vesting" than younger employees.  Yet a decision by the company to fire an older employee solely because he has nine-plus years of service and therefore is "close to vesting" would not constitute discriminatory treatment on the basis of age.  The prohibited stereotype ("Older employees are likely to be _____") would not have figured in this decision, and the attendant stigma would not ensue.  The decision would not be the result of an inaccurate and denigrating generalization about age, but would rather represent an *accurate* judgment about the employee – that he indeed is "close to vesting."

<u>Id</u>. at 611-612.  (Emphasis in original).

Relying upon <u>Hazen</u>, the Court of Appeals for the Third Circuit affirmed an order of summary judgment for the defendant where a plaintiff claimed he was the subject of age

---

[1]Although the Court of Appeals for the Third Circuit has not yet accepted a hostile work environment theory in an ADEA case, I assume for the purposes of this motion that it would do so.

11

discrimination when he was terminated because of his high salary which, he argued, correlated with his age. Bernhard v. Nexstar Broadcasting Group, Inc., 146 Fed. Appx. 582 (3d Cir. 2005). The Bernhard court wrote: "Bernhard's salary is analytically distinct from his age, and therefore, could serve as a legitimate reason for terminating him." Id. at 858.

Here, even though Dr. Salkin is well over forty, his tenured status is analytically distinct from his age. If there was a plan to replace tenured faculty with CETs because they are easier to control by virtue of the conditions of their employment, its goals would have been met if Dr. Salkin had been replaced with a CET of his own age.

Because Dr. Salkin has not named a younger comparitor, he has not met the fourth requirement for a *prima facie* case of disparate treatment under the ADEA. He cannot, therefore, show disparate treatment.

C.   Disparate Impact

Dr. Salkin has not raised a disparate impact theory. He has, instead, supported his case with numerous allegations of disparate treatment, as discussed in the fact section of this opinion. The consolidated response to the four motions for summary judgment does not appear to raise a disparate impact theory either, although there is a rather cryptic reference to disparate impact in Title VII cases.

Nevertheless, I will briefly point out that, even if it had been raised, a disparate impact theory would not have passed summary judgment on the record before me. To the extent that Dr. Salkin relies upon the theory that the Dental School sought to drive out tenured faculty, he may have alleged a plan which affected only people over 40, if there were no younger tenured faculty members in his Department in the relevant time period. See Defendants' Exhibit E.

12

However, Dr. Salkin has only alleged a general pattern of harassment, and not a specific practice on the part of the Dental School.  The United States Supreme Court has said:

> It is not enough to simply allege that there is a disparate impact on workers, or point to a generalized policy that leads to such an impact.  Rather, the employee is "responsible for isolating and identifying the *specific* employment practices that are allegedly responsible for any observed statistical disparities."  [Wards Cove Packing Co. v. Atonio] 490 U.S. [642,] 656, 109 S. Ct. 2005 (emphasis added).

Smith v. City of Jackson, Mississippi, 544 U.S. 228, 241 (2005).

Dr. Salkin has not pointed to any specific employment practice on the part of the Dental School which would tend to favor either younger tenured professors, or younger CETs.  Just as important, he has not come forward with statistical material which would show a disparity.

D.     Retaliation

In his Complaint, Dr. Salkin asserts that he was subject to retaliation by the Defendants after he filed his dual complaint with the EEOC and PCHR.  Specifically, he has alleged: "Plaintiff exercised his rights under the PCHR and EEOC.  Because Plaintiff exercised his statutorily protected rights, Defendant University retaliated against him by refusing to give well-deserved merit salary increases or even basic cost of living salary increases."  Complaint at ¶ 36.

It does not appear, however, that Dr. Salkin ever amended his administrative complaint to add a charge of retaliation, nor did he file a new administrative complaint containing this allegation.  A party seeking relief under the ADEA must exhaust his or her administrative remedies as required by 29 U.S.C. § 626(d).  Watson v. Eastman Kodak Co., 235 F.3d 851, 854 (3d Cir. 2000); and see Money v. Provident Mutual Life Insurance Co., 189 Fed. Appx. 114, 117 (3d Cir. 2006) (not precedential).  Since Dr. Salkin's retaliation claim is unexhausted, it can not be a basis for relief here.

E.      The State Causes of Action

Age discrimination claims brought pursuant to the PHRA are analyzed under the same standards used by federal courts in interpreting the ADEA. <u>Simpson v. Kay Jewelers</u>, 142 F.3d 639, 644 n. 5 (3d Cir. 1998). It is less clear what law is used to analyze a case brought under the PCFO. Federal courts considering cases with PCFO claims appear to assume that the well-developed federal civil rights case law applies. <u>See</u>, <u>e.g.</u>, <u>Joseph v. Continental Airlines, Inc.</u>, 126 F. Supp.2d 373 (E.D. Pa. 2000) (granting summary judgment in an employment discrimination case asserting claims under Title VII, PHRA and PCFO). Since Dr. Fielding has not pointed to any other relevant PCFO standard, I will also assume that the federal analysis applies.

IV.     Conclusion

For the reasons set forth above, I now enter the following:

## O R D E R

AND NOW, this   25th     day of   June    , 2007, upon consideration of Defendants' Motion for Summary Judgment as to Plaintiff Leslie Salkin, filed in this case as Document No. 35, and Plaintiffs' response thereto, as well as Defendants' reply, it is hereby ORDERED that Defendants' Motion is GRANTED. JUDGMENT is ENTERED in favor of Defendants and against plaintiff Leslie Salkin, and Leslie Salkin's Complaint is hereby DISMISSED with prejudice. This case shall be marked as CLOSED for statistical purposes.

                   BY THE COURT:

                   /s/Jacob P. Hart
                   _____
                   JACOB P. HART
                   UNITED STATES MAGISTRATE JUDGE