IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DR. LESLIE SALKIN, et al.          :        CIVIL ACTION
                                    :

      v.                             :
                                    :

TEMPLE UNIVERSITY, et al.       :        NO. 05-6579

ORDER AND OPINION

JACOB P.  HART                           DATE:   June 25, 2007
UNITED STATES MAGISTRATE JUDGE

Four cases are consolidated under this caption.  In each case, a professor or former

professor at the Temple University School of Dentistry has asserted claims against the University

and certain individual defendants under the ADEA, 29 U.S.C. § 621, *et seq*., and related state

causes of action, for age discrimination.  The Defendants have filed four separate summary

judgment motions, one for each plaintiff.  Here, for the reasons set forth below, I will grant

Defendants' motion regarding plaintiff Kenneth Boberick.

I.        Factual and Procedural Background

Kenneth Boberick was born in 1960.  Boberick Deposition Transcript, attached as an

Exhibit in Defendants' Appendix, at 9.  He came to Temple University as an assistant professor

on the tenure track in 1994.  Id. at 17.  He became an associate professor with tenure in 2000.  Id.

at 18-20.  As of the date of this opinion, he remains employed in that position.  Dr. Boberick

explained at his deposition that he is not yet eligible to be considered for full professor, but

intends to apply when he is eligible.  Id. at 19.

Dr. Boberick has sued Temple, as well as Dr. Daniel Boston, the chair of the Department

of Restorative Dentistry to which Dr. Boberick belonged, and Martin Tansy, Ph.D., Dean of the

School of Dentistry.  Boberick Complaint, caption.  He has asserted claims for age discrimination

and retaliation under the ADEA, and the same claims under the Pennsylvania Human Relations

Act ("PHRA"), Pa. C.S.A. § 955, and the Philadelphia Code Fair Practices Ordinance ("PCFO")

§ 9-1110.  Id. at ¶ 32-54.

Dr. Boberick, testified at his deposition that he has been mistreated because of his age.

Deposition at 38.  When asked "what does that mean?", he responded:

> Temple University has a policy whereby older tenured faculty members are put in
> a situation where they cannot perform and do the duties that are required of them.
> At the same time, I believe the university has a policy to remove the tenured
> faculty from the dental school and replace them with clinical educator track
> instructors.

Id.

He explained that this use of clinical educator track instructors ("CET"s) "allowed the

administration to remove the checks and balances that were previously in place."  Id. at 39.  Only

tenured faculty have the job security to raise challenging questions, such as whether students

should be allowed to graduate from the School of Dentistry with grade point averages lower than

2.0.  Id. at 39-40.

However, Dr. Boberick has not disputed the accuracy of material compiled by Bonny

Reeder, Director for Administrative Services at the School of Dentistry, and provided to

Defendants in discovery, that every single CET working in the Restorative Dentistry Department

was not only over 40, but older than Dr. Boberick, in the academic years 2001-2002, 2002-2003,

2003-2004, 2004-2005, and 2005-2006.   Defendants' Exhibit E.

Dr. Boberick has come forward with no direct evidence of discrimination.  At his

deposition, counsel asked:

> Just so I have a clean question and a clean answer, did you ever personally hear

any department chair express that policy orally to you and that policy being a
desire to force tenured faculty out of the school and replace them with younger
clinician educators?

DR. BOBERICK:  No.

Id. at 186.

Dr. Boberick has alleged that Dr. Boston stated to him at a verbal performance evaluation

in 2001:  "I will get something and use it against you."  Id. at 110.  Dr. Boberick inferred that this

was an age-related statement because "I am old"  (Dr. Boberick was 41 years old in 2001).  Id.  A

minute later, however, this exchange took place with counsel:

DR. BOBERICK:  His statement in my  mind was aggressive.  The reason he gave
it may have been because of my age.  I do not know what was in his mind.  It
could very easily have been that.

COUNSEL:  And it could equally have been that he didn't like people with beards,
correct?

DR. BOBERICK:  I have no idea.

Id. at 112.  Dr. Boston denies having made the statement.  Boston Deposition at 103, attached as

part of Exhibit 10 to Plaintiffs' Response.

However, Dr. Boberick has pointed to a number of things which he believes constitute

indirect evidence of age discrimination, based on the essential idea that these policies and actions

prevent him from developing his career, and would, therefore, drive him out of the Temple

School of Dentistry.  See id. at 69 ("Now, as a tenured faculty  member, trying to make a name

for myself in academia, [the student contact policy, discussed infra,] is forcing me out of the

university.  I cannot further my career at the level that is required to become a full professor at

Temple or any other university based on the working conditions that heave been outlined over

the course, since 1999").

First, Dr. Boberick complains of Dr. Boston's opaque system for determining which faculty members he will recommend for a merit raise each year.  Dr. Boberick filed a personnel complaint against Dr. Boston on this subject on January 6, 2003.  Memorandum from Dr. Boberick to Dr. Esposito of January 8, 2003, attached as part of Exhibit 22 to Plaintiffs' Response.  In it:

> 1.      He requested of the department chair a copy of the written departmental policy outlining the procedure used and an accounting of how individual criteria are weighted with regard to merit raises for the Department of Restorative Dentistry.
>
> 2.      He requested the average department merit increase for the last three years.
>
> 3.      He requested written documentation regarding his determination of merit for the last three years.

Report of Personnel Committee, attached as part of Exhibit 22 to Plaintiffs' Response.

In a report issued on April 30, 2003, the Personnel Committee found merit in Dr. Boberick's concerns, and recommended changes in Dr. Boston's evaluation procedure consistent with those concerns.  Id.  Nevertheless, Dr. Boston recommended to Dean Tansy that the recommendations be rejected.  Memorandum from Dr. Boston to Dean Tansy of May 2, 2003, attached as part of Exhibit 22.  Dean Tansy informed the chairman of the personnel committee that he would not adopt the suggested changes.  Memorandum from Dean Tansy to Dr. Esposito of May 14, 2003, attached as part of Exhibit 22.

At Dr. Boberick's deposition, the following exchange took place on this subject:

COUNSEL:  And what words in your personnel complaint evidenced that you made a complaint of discrimination January 6, 2003?  And you can just quote them.

DR. BOBERICK:  I believe the statement "The dental school is not part of the collective bargaining contract and therefore uses its own process for faculty evaluation."

COUNSEL:  Is that a complaint of discrimination on the basis of age?

DR. BOBERICK:  Yes.

Deposition at 206.

Dr. Boerick also asserts that he was often denied funding to travel to professional events.  Id. at 207.  He conceded at his deposition that there was a budget freeze in place during the time he requested funds.  Id.  When asked:  "Are you contending that the budget freeze was an act of discrimination on the basis of your age?", Dr. Boberick responded:  "Yes."  Id. at 212.  He admitted that he did not know of anybody who did receive funding during the period of the budget freeze.  Id.

Further, Dr. Boberick maintains that the Dental School stood in the way of a funded research project he and Dr. Salkin (a co-plaintiff in this action) were about to undertake with Drexel University.  Id. at 152-181.  The nature of the project as a whole was to determine whether intervention after the birth of a first pre-term baby would prevent a woman from going into pre-term labor in subsequent pregnancies.  Id. at 154.  Drs. Boberick and Salkin would provide dental care, thus removing oral sources of infection, which are thought to be a factor in pre-term birth.  Id. at 154-155.

It is not disputed that Dr. Boston, and other Dental School higher-ups, became involved with the Drexel University research grant after Dr. Boberick and Dr. Salkin had already worked with Dr. Ken Soprano, another Dental School professor, to obtain the grant, and it is not disputed that the offer of a grant was ultimately withdrawn soon after the research coordinator from Drexel met with Dr. Boston.  Id. at 166-167, 171-172; Dr. Boston Deposition at 103-110.

Dr. Boberick testified at his deposition: "Is it not in the best interest of the university to receive grants? Why then would they do it? What is the rationale? Get rid of the faculty members." Dr. Boberick Deposition at 88. Dr. Boberick expressed his dissatisfaction with the fact that Dr. Suzuki, a recent hire, appeared to be participating in pre-term birth weight research: "so, why new faculty member would say that he would perform pre-term birth weight research without previous experience is unexplained at this time." Dr. Boberick's Deposition at 176-177. Dr. Suzuki is a tenured professor who was born in 1946. Defendants' Exhibit D.

Finally, Dr. Boberick complains of a policy which troubles each of the plaintiffs in these consolidated cases – that of 100% contact time. In 1999, the Dental School adopted a policy applying to all full-time faculty, including CET's, whereby "all scheduled non-student/non-teaching contact time (i.e., "release time") must be petitioned for, justified, and approved in advance." Memorandum to Periodontology Department Faculty of August 30, 1999, and Memorandum to Department Chairs from Dean Tansy of March 24, 1999, both attached as Defendants' Exhibit 98. In other words, all of a faculty member's time is initially presumed to be spent in contact with students; exceptions for class preparation, administrative activities or research required prior permission after petition to the department chair. Id.

Dr. Boberick expressed distaste for this policy at his deposition. Boberick Deposition at 66-67. He explained that Dr. Boston told him his teaching hours were not considered toward a merit pay increase, because "it's my job," and that he did not have enough non-contact time to pursue other activities which would be deemed meritorious, such as research: "I can't even go out and see people and talk to them and ask them about research projects because my chairman won't let me. I have to give him two weeks' notice in order to book myself out of the clinic. There is no spontaneity." Id. at 83, 85.

However, when asked:  "Did Dr. Boston treat you less favorably than any younger tenured faculty member with respect to the granting of release time or sabbaticals?", Dr. Boberick replied:  "I have no idea."  Id. at 134.

As a related matter, counsel for the Defendants showed Dr. Boberick a copy of the Dental School's "Guidelines for Merit Pay", dated June, 2005.  Document attached as Exhibit 134.  The Guidelines provided that activities for which a faculty member was compensated, either by a reduction in his/her other duties, or by funding, would not necessarily be considered in merit salary evaluations.  Id; Deposition at 80-81.  Dr. Boberick testified:

> It affects whether or not as a tenured faculty member I need to  make a choice.
> It's telling me here that if I choose to accept release time and I perform something
> meritorious, I will not be compensated monetarily.  So what is my incentive as a
> faculty member to do something meritorious?  There is none.

Id. at 82.  Dr. Boberick found it "obscene" that he would be required to choose between professional development and monetary compensation.  Id.

Counsel for defense asked Dr. Boberick:  "Have you ever been adversely affected economically by your requesting release time for scholarship?"  Deposition at 107.  Dr. Boberick replied:  "I have no idea."  Counsel also asked:  "Do you have any facts that would suggest that older tenured faculty members are treated any differently under Defendant's Exhibit 134 than younger tenured faculty members?"  Deposition at 109.  Dr. Boberick said:  "I don't have any knowledge.  I can't answer that."  Id.

On February 11, 2005, Dr. Boberick filed a dual complaint with the EEOC and the

Philadelphia Commission on Human Relations.  Defendants' Exhibit 141.  He received a right-

to-sue letter on November 22, 2005, and filed this action on February 21, 2006.  Complaint at ¶

5.

II.     Legal Standards

A.      Summary Judgment

Summary judgment is warranted where the pleadings and discovery, as well as any

affidavits, show that there is no genuine issue as to any material fact and that the moving party is

entitled to judgment as a matter of law.  Fed. R. Civ. Pr. 56.  The moving party has the burden of

demonstrating the absence of any genuine issue of material fact. Celotex Corp.. v. Catrett, 477

U.S. 317, 323 (1986).

When ruling on a summary judgment motion, the court must construe the evidence and

any reasonable inferences drawn from it in favor of the non-moving party.  Anderson v. Liberty

Lobby, supra at 255;  Tiggs Corp. v. Dow Corning Corp., 822 F.2d 358 , 361 (3d Cir. 1987).

Nevertheless, Rule 56 "mandates the entry of summary judgment ... against a party who fails to

make a showing sufficient to establish the existence of an element essential to that party's case,

and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett at 323.

B.      The ADEA

The ADEA prohibits employers from discriminating against individuals in hiring,

discharge, compensation, term, conditions or privileges of employment on the basis of their age.

29 U.S.C. § 623(a)(1); Duffy v. Paper Magic Group, Inc., 265 F.3d 163, 167 (3d Cir. 2001).

In ADEA cases involving indirect evidence, a court will apply a modified version of the burden-

shifting analysis developed by the Supreme Court for use in Title VII cases in McDonnell

Douglas Corp. v. Green, 411 U.S. 792 (1973).  Anderson v. Consolidated Rail Corp., 297 F.3d

242, 249 (3d Cir. 2002).

Under the first step of the McDonnell-Douglas analysis, a plaintiff must establish a prima

facie case.  To show disparate treatment under the ADEA, a prima facie case is established by

showing by a preponderance of the evidence that (1) the plaintiff belongs to the protected class,

i.e., is older than forty; (2) the employee was qualified for the position in question; (3) he

suffered an adverse employment action; and (4) a similarly situated younger person was treated

more favorably.  Williams v. Pittsburgh Public Schools, 03cv1983, 2006 WL 515586 (W.D. Pa.

Feb. 28, 2006).

If the plaintiff is able to show a prima facie case, the burden of production shifts to the

employer, who must offer evidence of a legitimate, non-discriminatory reason for its actions.

McDonnell Douglas, supra; Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994); Williams, supra.

If the employer can do this, the burden of production returns to the plaintiff, who, in order to

avoid summary judgment, must show by a preponderance of the evidence that the explanation

given for the employment decision is a pretext for discrimination.  Fuentes, supra; Williams,

supra.

It is also possible to show discrimination under a disparate impact theory.  A *prima facie*

case under a disparate impact theory requires a showing that an employment practice that is

facially neutral in its treatment of different groups in fact falls more harshly on one group than

another and cannot be justified by business necessity.  Hazen Paper Company v. Biggins, 507

U.S. 604, 609 (1993).  Proof of discriminatory motive is not necessary under a disparate impact

theory.  Id.  Evidence in disparate impact cases usually focuses on statistical disparities, rather than specific incidents, and on competing explanations for those disparities.  Watson v. Forth Worth Bank & Trust, 487 U.S. 477, 987 (1988).

III.    Discussion

A.    Disparate Treatment

Dr. Boberick has not successfully established a *prima facie* case of age discrimination.  Unquestionably, he is over forty, and Defendants do not dispute that he is qualified for his position as assistant professor.  He has, therefore, shown the first two elements.  I will also assume for the purposes of this motion that Dr. Boberick has shown adverse employment actions, although Defendants maintain that he was, on the contrary, treated fairly with respect to salary increases, release time, and the Drexel University research project.

Crucially, however, Dr. Boberick has not shown that any similarly situated younger person was treated more favorably than he, whether a younger tenured professor (which would be the most similarly situated individual), or a younger CET.  In fact, his overarching theory of this case does not constitute a viable claim of age discrimination.  As described above, Dr. Boberick's theory is that he was subject to hostile treatment in order to drive him from his tenured position as part of a plan by the Dental School administration to "remove the checks and balances" on its behavior provided by tenured professors who can speak out without fear for their jobs.  If this is true, it is an age-neutral plan.

In Hazen Paper Company v. Biggins, 507 U.S 604 (1993), the United States Supreme Court decided that there is no disparate treatment under the ADEA when the factor motivating the employer is some feature other than the employee's age – even if the motivating factor is

correlated with age.  Id. at 609, 611.  In that case, the employee, Biggins, was terminated at the

age of 62 after nine years of service, a few weeks short of the date when his pension would vest.

The Supreme Court held that, although interference with pension benefits is illegal under ERISA,

Biggins' theory did not constitute age discrimination because pension-eligibility is "analytically

distinct" from age.  Id. at 611.

> The Supreme Court explained:
>
> Perhaps it is true that older employees of Hazen Paper are more likely to be "close
> to vesting" than younger employees.  Yet a decision by the company to fire an
> older employee solely because he has nine-plus years of service and therefore is
> "close to vesting" would not constitute discriminatory treatment on the basis of
> age.  The prohibited stereotype ("Older employees are likely to be _____")
> would not have figured in this decision, and the attendant stigma would not ensue.
> The decision would not be the result of an inaccurate and denigrating
> generalization about age, but would rather represent an *accurate* judgment about
> the employee – that he indeed is "close to vesting."

Id. 611-612.  (Emphasis in original).

For this reason, the Court of Appeals for the Third Circuit affirmed an order of summary

judgment for the defendant in a case where the plaintiff claimed he was the subject of age

discrimination when he was terminated because of his high salary, which, he claimed, correlated

with his age.  In Bernhard v. Nexstar Broadcasting Group, Inc., 146 Fed. Appx. 582 (3d Cir.

2005), Nexstar argued in its motion for summary judgment that it terminated Bernhard both

because of his work performance, and because of his high salary.  Bernhard argued that a

termination because of high salary was illegitimate, under the ADEA.  The Court of Appeals,

however, rejected this argument, writing:  "Bernhard's salary is analytically distinct from his age,

and therefore, could serve as a legitimate reason for terminating him under the Hazen Paper

analysis."   Id. at 585.

Clearly, Dr. Boberick's tenure status is analytically distinct from his age.  As a matter of simple logic, the Dental School could further its plan by replacing Dr. Boberick with a CET twenty years older than he.  In fact, two of the CETs in the Restorative Dentistry Department *were* twenty years older than Dr. Boberick.  Defendants' Exhibit E.  Even if CETs on average were shown to be younger than professors, this would be irrelevant under Dr. Boberick's disparate treatment theory, because the decisive factor in the discrimination is tenure, and not age.

Thus, Dr. Boberick's theory must be rejected as the basis for a disparate treatment theory. He has not made any alternative argument that, in some other way, Defendants' actions were motivated by "inaccurate or stigmatizing stereotypes" about the elderly, for example, a belief that "productivity and competence decline with old age."  Hazen Paper Co. at 507 U.S. 610.[1]  He "had no idea" whether Dr. Boston's alleged hostile statement to him was motivated by his age, which was 41 at the time.

Indeed, Dr. Boberick showed at his deposition a complete lack of awareness as to whether any younger similarly situated person was treated more favorably than he.  He explicitly stated that he "did not have any knowledge" whether older tenured faculty members were treated disparately under the Dental School's merit pay increase policies, or with respect to the granting of release time or sabbaticals.  He seemed to believe that Dr. Suzuki was treated more favorably in obtaining permission to conduct research, but Dr. Suzuki, as noted above, is 14 years older

---

[1]Indeed, it would be surprising if he had, since Dr. Boston was born in 1952, eight years before Dr. Boberick; Dean Tansy was born in 1937 and is now 70.  Boston Deposition at 134-135; Tansy Deposition, attached as part of Exhibit 1 to Defendants' Response at 103.  This fact may, as Defendants argue, make Dr. Boberick's claims of discrimination less plausible.  See Marlow v. Office of Court Administration of New York, 820 F. Supp. 753, 757 (S.D.N.Y. 1993), aff'd 22 F.3d 1091 (2d Cir.), cert. denied 115 S. Ct. 252 (1994).  I do not, however, consider it determinative in a summary judgment motion.

than Dr. Boberick.  Dr. Boberick's rather strange allegation that the Dental School-wide budget

freeze was an act of age discrimination pointed at him certainly did nothing to move the ball

toward a coherent theory.  Thus, Dr. Boberick has not made out a *prima facie* case of disparate

treatment.

B.        Disparate Impact

I will now briefly discuss this case in terms of a disparate impact theory.  The discussion

will be brief because it is clear that Dr. Boberick has not raised this theory in his complaint or in

discovery.  The consolidated response to the four motions for summary judgment does not appear

to raise a disparate impact theory either, although there is a rather cryptic reference to disparate

impact in Title VII cases.  Instead, Dr. Boberick has repeatedly supported his case with

allegations of disparate treatment, as discussed above.

Nevertheless, I will point out that even if a disparate impact theory had been raised, it

would not have passed summary judgment on the evidentiary record before me now.  Dr.

Boberick has alleged the existence of a policy on the part of Defendants which, as of the time his

Complaint was filed, affected only people over 40 – this is clear because Dr. Boberick was the

youngest tenured member of the department in the relevant time period.  See, Defendants'

Exhibit E.  However, he has only alleged a general pattern of harassment, and not a specific

practice on the part of the Dental School.  The United States Supreme Court has said:

> It is not enough to simply allege that there is a disparate impact on workers, or
> point to a generalized policy that leads to such an impact.  Rather, the employee is
> "'responsible for isolating and identifying the *specific* employment practices that
> are allegedly responsible for any observed statistical disparities.'"  [Wards Cove
> Packing Co. v. Atonio] 490 U.S. [642,] 656, 109 S. Ct. 2005 (emphasis added).

Smith v. City of Jackson, Mississippi, 544 U.S. 228, 241 (2005).

Dr. Boberick has not pointed to any specific employment practice on the part of the

Dental School which would tend to favor either younger tenured professors, or younger CETs.

Just as important, he has not come forward with statistical material which would show a

disparity.

C.      Retaliation

In his complaint, Dr. Boberick claims that he was subject to retaliatory treatment

following his personnel complaint challenging Dr. Boston's merit evaluation policies.

Complaint at ¶¶ 22-28.  Even if this is true, (and, as discussed above, Dr. Boberick has in most

cases "no idea" whether the treatment he received differed from the treatment of any other

faculty  member), the retaliation would not be compensable under the ADEA because the

personnel complaint raised no issue concerning age discrimination.  See Exhibit 22.  Dr.

Boberick's assertion in his deposition that the statement  "The dental school is not part of the

collective bargaining contract and therefore uses its own process for faculty evaluation" is a

claim of age discrimination, is patently incredible and does not create an issue of fact in this

regard.

Dr. Boberick's complaint here, which was filed in 2006, does not allege any retaliation

based on the filing of his EEOC complaint in February, 2005.  See Defendants' Exhibit 141.  The

Drexel research program may have been formally dropped after that date, but Dr. Boberick has

asserted that Dr. Boston's negative attitude toward the grant began much earlier, in an April 19,

2004, memorandum Dr. Boberick has characterized as "threatening."  Id. at 171-172, 179-180.

Similarly, the alleged discrimination in release time and student interface time, while they may

have continued after February, 2005, began before then.

I conclude, therefore, that Dr. Boberick cannot show a *prima facie* case of retaliation

under the ADEA, under which adverse employment actions must have taken place after or at the

same time as the employee's protected activity, in order to show the required causal connection.

See Robinson v. City of Pittsburgh, 120 F.3d 1286, 1301 (3d Cir. 1997).

D.      The State Court Actions

Age discrimination claims brought pursuant to the PHRA are analyzed under the same

standards used by federal courts in interpreting the ADEA.  Simpson v. Kay Jewelers, 142 F.3d

639, 644 n. 5 (3d Cir. 1998).  It is less clear what law is used to analyze a case brought under the

PCFO.  However, federal courts considering cases with PCFO claims appear to assume that the

well-developed federal civil-rights case law applies.  See, e.g., Joseph v. Continental Airlines,

Inc., 126 F. Supp.2d 373 (E.D. Pa. 2000) (granting summary judgment in an employment

discrimination case asserting claims under Title VII, PHRA and PCFO).  Since Dr. Boberick has

not pointed to any other relevant PCFO standard, I will also assume that the federal analysis

applies.

IV.     Conclusion

For the reasons set forth above, I now enter the following:


O R D E R

AND NOW, this    25th    day of June, 2007, upon consideration of Defendants' Motion

for Summary Judgment as to Plaintiff Kenneth Boberick, filed in this action as Document No.

34, and Plaintiffs' response thereto, as well as Defendants' reply, it is hereby ORDERED that

Defendants' Motion is GRANTED.  JUDGMENT is ENTERED in favor of Defendants and

against Plaintiff Kenneth Boberick, and Kenneth Boberick's Complaint is hereby DISMISSED

with prejudice.

This case shall be marked CLOSED for statistical purposes.

BY THE COURT:

*/S/ Jacob P. Hart*
JACOB P. HART
UNITED STATES MAGISTRATE JUDGE