IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DR. LESLIE SALKIN, et al.         :      CIVIL ACTION
:
v.                                            :
:
TEMPLE UNIVERSITY, et al.       :      NO. 05-6579

ORDER AND OPINION

JACOB P. HART                                       DATE:   June 25, 2007
UNITED STATES MAGISTRATE JUDGE

      Four cases are consolidated under this caption. In each case, a professor or former professor at the Temple University School of Dentistry has asserted claims against the University and certain individual defendants under the ADEA, 29 U.S.C. § 621 et seq., and related state causes of action, for age discrimination. The Defendants have filed four separate summary judgment motions, one for each plaintiff. Here, for the reasons set forth below, I will grant Defendant's motion regarding plaintiff Allen F. Fielding.

I.      Factual and Procedural Background

      Dr. Fielding was born in 1939. Fielding Deposition, attached to Defendants' Appendix, at 4. He came to the Temple University Dental School in 1969 as an assistant professor. Id. at 24. In approximately 1973, he became an associate professor with tenure, and he was promoted to full professor a few years later. Id. at 26-27; Complaint at ¶ 11. Dr. Fielding resigned his position at the Dental School in 2005. Fielding Deposition at 28. On December 28, 2005, he filed dual complaints with the EEOC and the PCHR. Defendants' Exhibit 412. He filed this action on or after September 27, 2006.

      Dr. Fielding has sued Temple University as well as Dr. Michael Pliskin, who became Dr. Fielding's supervisor in 2000 as a result of his appointment as chair of the Department of Oral

and Maxillofacial Medicine and Surgery, and Martin Tansy, Ph.D., Dean of the School of Dentistry.  Dr. Fielding has asserted a claim of age discrimination under the ADEA, and the same claim under the Pennsylvania Human Relations Act ("PHRA"), Pa. C.S.A. § 955, and the Philadelphia Code Fair Practices Ordinance ("PCFO") § 9-1110.  Id. at 32-55.

In his Complaint, Dr. Fielding alleged that comments were made to him which would arguably constitute direct evidence of discrimination.  He said he was told it was "time for him" to leave.  Complaint at ¶ 14.  The Complaint also states:  "Indeed, Plaintiff learned that his professional practice was to be better served by his forced retirement and his replacement with a 'young turk.'"  Id. at ¶ 15.  (Although the term appears in the Complaint in quotation marks, it is not clear whether the term "young turk" is intended as a quote).  The Complaint does not identify any speaker, date or context for these statements.

At his deposition, Dr. Fielding specified that Dr. Pliskin was the only individual who discriminated against him.  Fielding Deposition at 171.  When asked whether Dr. Pliskin ever made any statements "to indicate that he had an animosity toward people on account of their age," Dr. Fielding replied:  "Just toward myself."  Id. at 94.  The only statement Dr. Fielding identified was one to the effect that "I have been here an awful long time."  Id. at 94.  He did not remember the context in which the statement was made.  Id.

As to indirect evidence, Dr. Fielding has alleged that "as early as November, 2000," he was "treated in a disparate manner with regard to hours, pay and conditions of work relative to younger personnel."  Complaint at ¶ 18.  He testified at his deposition that Dr. Pliskin constantly treated him with disrespect, and that he could not "pick out every instance."  Fielding Deposition at 83-85.  He stated: "In other words, anybody who I think is trying to go ahead and work with

somebody and doesn't respect their opinion is belittling and in a way of hassling somebody." Id. at 85-86.

However, Dr. Fielding did identify certain instances of what he believed was discriminatory treatment. He maintains that, in May, 2000, he suggested to Dr. Pliskin a change in the Dental School's system for responding to dental emergencies, which were called "Code 99s." Id. at 84, 107. He maintained that he "continually asked [Dr. Pliskin] about changing" the system, but that Dr. Pliskin would brush him off: "Well, I would meet him and I would say something about, you know, we had another Code 99 and we're having problems. And he would just treat me with such mediocrity like that's you know, something that I'll have to address." Id. at 84. Dr. Fielding said that it was not until November of that year that his colleague, Andrea Haber-Cohen, received a memorandum on the subject, and not until the next February that Dr. Pliskin spoke to them about it. Id., and see 74 (identifying Dr. Haber-Cohen).

Dr. Fielding was asked at his deposition:

COUNSEL: And what is it about the process of a Code 99 that you viewed as discriminating against you on the basis of your age?

DR. FIELDING: I was the only one that would go and handle Code 99 first. And if I wasn't there, everyone else would go only after I would go. And I was told that I should be very responsive to the Code 99s by Dr. Pliskin at one point.

Id. at 107-108.

Dr. Fielding did not know the details of the then-current emergency protocol:

COUNSEL: Is it only because you were the only one that had to respond to Code 99s that made you believe that you were being singled out for having to attend the Code 99s so quickly?

DR. FIELDING: I felt that I was always the first responder, although Dr. Cohen has a medical degree, and Dr. Feinstein has been trained in the process of taking care of emergencies, that I was sort of pushed out first.

> COUNSEL:  And do you have any knowledge as to whether Dr. Cohen or Dr. Feinstein were expected to respond to Code 99s quickly?
>
> DR. FIELDING:  I do not know exactly what the protocol was.
>
> COUNSEL:  And you do not know exactly what the requirements were with respect to either of those two doctors having to respond to Code 99s, correct?
>
> DR. FIELDING:  I do not.
>
> COUNSEL:  By "I do not", you mean you do not have personal knowledge; correct?
>
> DR. FIELDING:  Correct.

Id. at 108-109.

Dr. Fielding also felt that Dr. Pliskin treated him unfairly regarding a July, 2000, request for unpaid leave to attend to his mother's estate.  Id. at 85.  Dr. Pliskin responded to Dr. Fielding's written request for leave in a memorandum of July 14, 2000, stating:

> I have reviewed your request for a 30 day unpaid leave and have decided not to support it.  My primary concern is that your absence for 30 days will have an unacceptable negative impact on patient care and student education.
>
> If you can develop an alternative plan which is agreeable to me and your colleagues I will be pleased to review it.

Memorandum, attached as Exhibit 197 in Defendants' Appendix.

> Dr. Fielding was asked:
>
> COUNSEL:  What would you have viewed as a non-discriminatory response by Dr. Pliskin to your request that you take a month off to handle the legal affairs of your mother?
>
> DR. FIELDING:  I would have if I were the chair, I would have met with the individual, and I would have worked out some type of plan that would be beneficial to the individual as well as the clinic.

Id. at 11.  It is not clear whether Dr. Fielding ever came to Dr. Pliskin with an "alternative plan."

This exchange followed:

COUNSEL:  Is there anything in the denial process, the procedural aspects of the denial process that was different from the way any other request for leave of absence of any faculty member at the School of Dental Medicine was treated?

DR. FIELDING:  I would not have that information.

COUNSEL:  And is there anything in the decision itself denying you that 30-day requested leave for that reason that is different from the way any other person at the Temple University School of Dental Medicine was treated for such a request?

DR. FIELDING:  I couldn't answer that question, either.

COUNSEL:  And that's because you don't have knowledge of that, correct?

DR. FIELDING:  Correct.

Id. at 120.

Dr. Fielding also testified that it was age discrimination which led Dr. Pliskin, in 2000, to ban him from taking two half-days off per week, rather than one whole day.  He testified that Dean Tansy had forbidden the practice of splitting days some twelve years earlier, but that other department chairs had nevertheless permitted him to continue to do it "until Dr. Pliskin came in and just denied it."  Id. at 100-102.  No one else in the department was working split days in the department at the time Dr. Pliskin became department chair.  Id. at 103.  Dr. Fielding's Memorandum to Dr. Pliskin, appealing this action, did not reference age discrimination. Plaintiffs' Exhibit 24.

In a memorandum dated April 4, 2001, Dr. Fielding complained to Dean Tansy of Dr. Pliskin's reaction to his criticism of new, extended clinic hours:  "He informed me that, while he is chairman, I will follow his dictum, and that if I do not like his administration I am free to leave."  Plaintiffs' Exhibit 25.  Dr. Fielding conceded at his deposition that the extended clinic hours applied to the entire Department, and not only to him.  Fielding Deposition at 201.

Dr. Fielding also complains of Dr. Pliskin's application of a policy which troubles each of the plaintiffs in these consolidated cases – that of 100% contact time. In 1999, the Dental School adopted a policy applying to all full-time faculty, including CETs, whereby "all Scheduled non-student/non-teaching contact time (i.e., "release time") must be petitioned for, justified, and approved in advance." Memorandum to Periodontology Department Faculty of August 30, 1999, and Memorandum to Department Chairs from Dean Tansy of March 24, 1000, both attached as Defendants' Exhibit 98. In other words, all of a faculty member's time is initially presumed to be spent in contact with students; exceptions for class preparation, administrative activities or research required prior permission after petition to the department chair. Id.

According to Dr. Fielding, Dr. Pliskin did not permit him sufficient release time to prepare for his lectures. Id. at 122-123. Dr. Fielding testified that faculty members Dr. Peter Giannini, Dr. Fornatora, and Dr. MacPhail, were given more time off to prepare for lectures. Id. at 125. However, Dr. Fielding was not certain how much release time these doctors actually had. Id. at 126. Neither Dr. Fielding's Complaint, nor his response to the motion for summary judgment includes any testimony or representation by Dr. Giannini, Dr. Fornatora, Dr. MacPhail, or any other form of information which could corroborate Dr Fielding's belief that they were treated more favorably than he.

Dr. Fielding has similarly made other allegations of bad treatment where he is unable to show that other faculty members were treated more favorably:

1. Dr. Pliskin denied Dr. Fielding's request that he be permitted to travel to Chicago to review national board results for Temple students, who were not performing adequately. Id. at 131-132. Dr. Fielding had no knowledge as to whether another faculty member was granted this authority. Id. at 133-134.

2. Dr. Pliskin denied Dr. Fielding's request for release time in order to instruct dental students in the operating room. Id. at 194-196. Dr. Fielding did not know whether Dr. Pliskin had granted or denied a similar request for any other faculty member. Id. at 226-227.

3. Dr. Fielding testified that Dr. Pliskin usually denied his request for funds to attend professional meetings, "and then [Dr. Fielding] had to beg for funds with him before [he] got the funds to go to such meetings." Id. at 136. He did not know whether "there was something different in that process from the process to which other faculty members who reported to Dr. Pliskin had to go." Id.

4. Dr. Pliskin would not approve Dr. Fielding's appointment to the University's Institutional Review Board. Id. at 204-205. The day after Dr. Fielding was appointed, Dr. Pliskin wrote a memorandum to the manager of the Board, stating: "I cannot have members of my faculty making *ad hoc* arrangements to serve on committees without my knowledge or approval. This undermines my responsibility and authority as departmental chair and is unacceptable." Memorandum, attached as Plaintiffs' Exhibit 32. Dr. Fielding did not know whether other faculty members had served on committees without Dr. Pliskin "asserting control" over the appointments. Fielding Deposition at 207-208.

5. Dr. Fielding stated that he left Temple because "I felt I was not appreciated by my chair by giving me zero raise [*sic*] all the way across the board." Id. at 177. Upon questioning, it became clear that he had received "zero raise" only in the one year before he left. Id. at 177-178. In other years, he had received raises, but "other individuals" in his division had told him that the percentage of his raise was less that theirs. Id. Dr. Fielding did not know if the dollar amount of the raises received by his colleagues was greater than his. Id. at 178-179.

Finally, although Dr. Fielding's complaint in this action does not allege retaliation, the subject was discussed at his deposition. Dr Fielding testified that he was wrongly passed over for the jobs of (a) Director of the Division of Oral And Maxillofacial Surgery; (b) senior executive to the Dean; and (c) financial officer. The first position was filled "when Dr. Pliskin became head of the Division of Oral and Maxillofacial Surgery." Id. at 144. Dr. Fielding testified that the decisions on the other two positions were "probably" made by Dean Tansy, possibly with the assistance of a committee. Id. at 164. He also testified that he could not comment as to whether Dean Tansy acted towards him "in a retaliatory way" because of his having raised claims of age discrimination. Id. at 166. Dean Tansy continued to act with Dr. Fielding in a "friendly and collegial way." Id.

During the deposition, defense counsel asked Dr. Fielding what he was trying to achieve in the litigation. Dr. Fielding answered:

> I believe that one of the most important factors is to show what – when you asked me the question before what I thought of Dr. Pliskin, and I answered the fact that I did not feel that he was ethical. I did not go into why I did not feel he was ethical about the things that he did. I did not feel that he was collegial, and I did not go into those. And I did not go into the fact that I said that he does not belong in the position that he is as far as the dean of the clinic and the chair of his division. And if I were to go ahead and go through all of those, you would realize that I would just like to see this man answer to those accusations that I've made and to see whether or not the dean feels that this man belongs in the position that he is in.

Id. at 188-189.

II.     Legal Standards

A.      Summary Judgment

Summary judgment is warranted where the pleadings and discovery, as well as any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. Pr. 56. The moving party has the burden of demonstrating the absence of any genuine issue of material fact. Celotex Corp.. v. Catrett, 477 U.S. 317, 323 (1986).

When ruling on a summary judgment motion, the court must construe the evidence and any reasonable inferences drawn from it in favor of the non-moving party. Anderson v. Liberty Lobby, supra at 255; Tiggs Corp. v. Dow Corning Corp., 822 F.2d 358 , 361 (3d Cir. 1987). Nevertheless, Rule 56 "mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett at 323.

B.      The ADEA

The ADEA prohibits employers from discriminating against individuals in hiring, discharge, compensation, term, conditions or privileges of employment on the basis of their age. 29 U.S.C. § 632(a)(1); Duffy v. Paper Magic Group, Inc., 265 F.3d 163, 167 (3d Cir. 2001). In ADEA cases involving indirect evidence, a court will apply a modified version of the burden-shifting analysis developed by the Supreme Court for use in Title VII cases in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Anderson v. Consolidated Rail Corp., 297 F.3d 242, 249 (3d Cir. 2002).

Under the first step of the McDonnell-Douglas analysis, a plaintiff must establish a *prima facie* case. To show disparate treatment under the ADEA, a *prima facie* case is established by showing by a preponderance of the evidence that (1) the plaintiff belongs to the protected class; i.e., is older than forty; (2) the employee was qualified for the position in question; (3) he suffered an adverse employment action; and (4) a similarly situated younger person was treated more favorably. Williams v. Pittsburgh Public Schools, Civ. A. No. 03-1983, 2006 WL 515586 (W.D. Pa. Feb. 28, 2006).

If the plaintiff is able to show a *prima facie* case, the burden of production shifts to the employer, who must offer evidence of a legitimate, non-discriminatory reason for its actions. McDonnell Douglas, supra; Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994); Williams, supra. If an employer can do this, the burden of production returns to the plaintiff, who, in order to avoid summary judgment, must show by a preponderance of the evidence that the explanation given for the employment decision is a pretext for discrimination. Fuentes, supra; Williams, supra.

It is also possible to show discrimination under a disparate impact theory. A *prima facie* case under a disparate impact theory requires a showing that an employment practice that is facially neutral in its treatment of different groups in fact falls more harshly on one group than another and cannot be justified by business necessity. Hazen Paper Company v. Biggins, 507 U.S. 604, 609 (1993). Proof of discriminatory motive is not necessary under a disparate impact theory. Id. Evidence in disparate impact cases usually focuses on statistical disparities, rather than specific incidents, and on competing explanations for those disparities. Watson v. Fort Worth Bank & Trust, 487 U.S. 477, 487 (1988).

III.  Discussion

A.  Direct Evidence

Dr. Fielding has not successfully shown any direct evidence of discrimination on the basis of age. There is no deposition testimony or any other evidence to corroborate the allegations in his complaint that he was told that it was "time for him" to go, or that he should be replaced by a "young turk." Dr. Pliskin's alleged statement to Dr. Fielding that he had been at Temple "an awful long time" is not, in itself discriminatory. Since Dr. Fielding could not remember the context of the remark, it cannot serve as direct evidence of discrimination.

B.  Indirect Evidence: Disparate Treatment

Dr. Fielding's case for disparate treatment fails because he has not come forward with evidence to support the final element of his *prima facie* case, as required by McDonnell Douglas. It is undisputed that Dr. Fielding is over forty and qualified for his position. I will also assume for the purposes of this motion that Dr. Fielding has shown adverse employment actions, although Defendants argue otherwise, and also argue that most of his complaints are time-barred.

However, Dr. Fielding has not shown that any similarly situated younger person was treated more favorably. His deposition testimony is long on examples of how he was treated unfairly and unwisely, but very short on the knowledge of more favorable treatment offered to younger colleagues. This evidence is necessary to create an inference that age discrimination caused the treatment. Crucially, in his response to Defendants' summary judgment motion, Dr. Fielding was not able to come forward with other evidence to fill in these gaps in his personal knowledge.

Neither does the response provide evidence of things Dr. Fielding claimed to know. For example, Dr. Fielding testified that his colleagues received higher pay increases in terms of percentage of salary. However, he has come forward with no factual evidence – in the form of deposition testimony of those colleagues, tabulated facts, or in any other form – to show this. Similarly, he has not come forward with any evidence that other faculty members were given more release time. Summary judgment is appropriate in an employment discrimination case when a plaintiff relies on 'mere inferences, conjecture, speculation or suspicions.' Huggins v. Teamsters Local 312, 585 F. Supp. 148, 150-151 (E.D. Pa. 1994), citing Robin Construction Co. v. United States, 345 F.2d 610, 613 (3d Cir. 1965).

The joint response to the four summary judgment motions relies heavily upon a theory that the Dental School planned to drive tenured faculty members away, and rely, instead, upon CETs over whom they could exert more control. Even if this is true (and, as I have just shown, it has not been proved) it does not constitute a viable claim of age discrimination because the plaintiffs have not shown that age, rather than tenure, was the factor motivating this plan.

In Hazen Paper Company v. Biggins, 507 U.S. 604 (1993), the United States Supreme Court decided that there is no disparate treatment under the ADEA when the factor motivating the employer is some feature other than the employee's age – even if the motivating factor is correlated with age. Id. at 609, 611. In that case, the employee, Biggins, was terminated at the age of 62 after nine years of service, a few weeks short of the date when his pension would vest. The Supreme Court held that, although interference with pension benefits is illegal under ERISA, Biggins' theory did not constitute age discrimination because pension-eligibility is "analytically distinct from age." Id. at 611.

The Supreme Court explained:

> Perhaps it is true that older employees of Hazen Paper are more likely to be "close to vesting" than younger employees. Yet a decision by the company to fire an older employee solely because he has nine-plus years of service and therefore is "close to vesting" would not constitute discriminatory treatment on the basis of age. The prohibited stereotype ("Older employees are likely to be _____") would not have figured in this decision, and the attendant stigma would not ensue. The decision would not be the result of an inaccurate and denigrating generalization about age, but would rather represent an *accurate* judgment about the employee – that he indeed is "close to vesting."

Id. at 611-612. (Emphasis in original).

Relying upon Hazen, the Court of Appeals for the Third Circuit affirmed an order of summary judgment for the defendant where a plaintiff claimed he was the subject of age discrimination when he was terminated because of his high salary which, he argued, correlated with his age. Bernhard v. Nexstar Broadcasting Group, Inc., 146 Fed. Appx. 582 (3d Cir. 2005). The Bernhard court wrote: "Bernhard's salary is analytically distinct from his age, and therefore, could serve as a legitimate reason for terminating him." Id. at 858.

In this case, even though Dr. Fielding is well over forty, his tenured status is analytically distinct from his age. If there is such a plan, its goals would have been met if Dr. Fielding had been replaced with a CET with his same date of birth.

Dr. Fielding testified that he wanted to show that Dr. Pliskin was incompetent and unqualified for the positions he held. However, the ADEA is not a vehicle for this. Even if Dr. Pliskin is, as Dr. Fielding suggests, running the Dental School straight into the ground, this is not actionable under the ADEA unless it is motivated by age discrimination. See Fuentes v. Perskie, supra, at 765 ("To discredit an employer's proffered reason ... the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether

13

discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent or competent").

C.     Disparate Impact

Dr. Fielding has not raised a disparate impact theory. He has, instead, supported his case with numerous allegations of disparate treatment, as discussed in the fact section of this opinion. The consolidated response to the four motions for summary judgment does not appear to raise a disparate impact theory either, although there is a rather cryptic reference to disparate impact in Title VII cases.

Nevertheless, I will briefly point out that, even if it had been raised, a disparate impact theory would not have passed summary judgment on the record before me. To the extent that Dr. Fielding relies upon the theory that the Dental School sought to drive out tenured faculty, he may have alleged a plan which affected only people over 40, since there may have been no younger tenured faculty members in his Department at the time. However, Dr. Fielding has only alleged a general pattern of harassment, and not a specific practice on the part of the Dental School. The United States Supreme Court has said:

> It is not enough to simply allege that there is a disparate impact on workers, or point to a generalized policy that leads to such an impact. Rather, the employee is "responsible for isolating and identifying the *specific* employment practices that are allegedly responsible for any observed statistical disparities." [Wards Cove Packing Co. v. Atonio] 490 U.S. [642,] 656, 109 S. Ct. 2005 (emphasis added).

Smith v. City of Jackson, Mississippi, 544 U.S. 228, 241 (2005).

Dr. Fielding has not pointed to any specific employment practice on the part of the Dental School which would tend to favor either younger tenured professors, or younger CETs. Just as important, he has not come forward with statistical material which would show a disparity.

D.      <u>Retaliation</u>

Dr. Fielding did not allege retaliation in his Complaint. Neither does he seem to have filed an administrative complaint alleging retaliation. <u>See</u> Defendants' Exhibit 412. Nevertheless, the subject arose at his deposition. Dr. Fielding testified to a belief that he was passed over for three positions for retaliatory reasons. However, the first position became available at the time Dr. Pliskin became chair of the Division of Oral and Maxillofacial Surgery, thus before Dr. Fielding had complained of Dr. Pliskin's behavior. To show a *prima facie* case of retaliation under the ADEA, the adverse employment action must have taken place after or at the same time as the employee's protected activity in order to show the required causal connection. <u>See</u> <u>Roginson v. City of Pittsburgh</u>, 120 F.3d 1286, 1301 (3d Cir. 1997).

Dr. Fielding testified that Dr. Pliskin, the only individual he claims discriminated against him, was not a decisionmaker as to the other two positions. Here, too, therefore, the element of causal connection is missing. Thus, even if Dr. Fielding had pled retaliation, he could not make a *prima facie* showing.

E.      <u>The State Causes of Action</u>

Age discrimination claims brought pursuant to the PHRA are analyzed under the same standards used by federal courts in interpreting the ADEA. <u>Simpson v. Kay Jewelers</u>, 142 F.3d 639, 644 n. 5 (3d Cir. 1998). It is less clear what law is used to analyze a case brought under the PCFO. Federal courts considering cases with PCFO claims appear to assume that the well-developed federal civil rights case law applies. <u>See</u>, e.g., <u>Joseph v. Continental Airlines, Inc.</u>, 126 F. Supp.2d 373 (E.D. Pa. 2000) (granting summary judgment in an employment discrimination case asserting claims under Title VII, PHRA and PCFO). Since Dr. Fielding has

not pointed to any other relevant PCFO standard, I will also assume that the federal analysis applies.

IV.     Conclusion

For the reasons set forth above, I now enter the following:

O R D E R

AND NOW, this   25th   day of   June   , 2007, upon consideration of Defendants' Motion for Summary Judgment as to Plaintiff Allen F. Fielding, filed in this case as Document No. 36, and Plaintiffs' response thereto, as well as Defendants' reply, it is hereby ORDERED that Defendants' Motion is GRANTED.  JUDGMENT is ENTERED in favor of Defendants and against plaintiff Allen F. Fielding, and Allen F. Fielding's Complaint is hereby DISMISSED with prejudice.

This case shall be marked as CLOSED for statistical purposes.

BY THE COURT:

/s/Jacob P. Hart
_____
JACOB P. HART
UNITED STATES MAGISTRATE JUDGE